gument, that these legatees have some claims as against the executors, such claims can only defeat a claim of credit for these lawful payments if they are sufficient to constitute an offset. With the claim of the executors admitted, should they be required to pay over to these legatees these moneys because there may be a possible offset upon their part? If the effect of this decree were to set aside these moneys to await the adjustment of equities, the conclusion might seem more plausible. But such is not the effect. By it the executors are compelled to pay the moneys to the legatees, for them to hold, without security, pending the adjustment of equities. It does not appear that either the legatees or devisees have any claims against the executors or Jones. If they consented to the exchange of property, they clearly are bound by it. Their claims are, at the most, possibilities. They furnish no warrant for the denial to the executors of a credit to which they are otherwise entitled. The decree of the surrogate's court should therefore be modified so as to give to the executors credit for the payment of the $1,100 and the $200 upon the land contract as of the date when paid. As they consent to a charge of $150, received in the exchange of land, their accounts may be charged therewith. The decree may be further modified so as to provide that it is without prejudice to the rights of the devisees to any right of action which they may have by reason of the assumed exchange of land by the executors. The decree, as thus modified, is in all respects affirmed, with costs of the appeal to the executors as against the contestant.

Decree of the surrogate's court modified as stated in the opinion, and, as so modified, affirmed, with costs of this appeal to the executors as against the contestant. All concur.

---

(29 Misc. Rep. 13.)

### WELDE v. NEW YORK & H. R. CO. .et al.

(Supreme Court, Special Term, New York County. August, 1899.)

1. EMINENT DOMAIN—VIADUCT—LIABILITY OF RAILROAD.

    Where the construction of a viaduct in a street was a part of the work of raising the grade of a railroad, as provided by an act of the legislature, and was planned by the board of improvement created by said act, which had entire control of the work, and the railroad company had only such an interest in the work as the nature of their subsequent use of the structure and their liability to pay for the same would render proper and necessary, such company is not liable for the loss and inconvenience which an abutting owner may have suffered during the period of construction by reason thereof, though such viaduct created an additional burden on his land.

2. SAME—ADDITIONAL BURDEN.

    A railroad company had a right of way to a strip 61 feet wide along the middle line of a street, with additional space necessary for embankments or excavations. The track was afterwards elevated, and a viaduct 82 feet in width, with perpendicular sides, constructed. Held, that the viaduct created an additional burden on abutting land by interfering in a greater degree with its enjoyment than did the tracks as they existed prior to its construction.

3. SAME—INJURIES TO ABUTTING OWNERS—LIABILITY.

    A viaduct was constructed in a street as part of the work of raising the grade of a railroad, as provided by statute, by a board of improvement

created by said act. Under authority of a later act the railroad company made changes in the viaduct, and erected stations thereon. *Held*, that the company was liable to abutting owners for injuries resulting by reason of and during such work, such as inconvenience resulting from blockading street, noise, etc.

Action by Charles Welde against the New York & Harlem Railroad Company and others. Judgment for plaintiff.

This action was brought to obtain an injunction to restrain defendant and its lessee, the New York Central & Hudson River Railroad Company, from conducting and maintaining an elevated railroad on 4th (now Park) avenue, in the city of New York, in front of plaintiff's premises, which are situated on the corner of Park avenue and 124th street, and from operating their trains thereon, and for damages. In pursuance of an act of legislature, passed in 1831 (Laws 1831, c. 263), defendant located its route along the center line of 4th avenue, from 23d street to the Harlem river. In 1832 one Isaac Adriance, owner of land in 4th avenue and the intersecting streets from 124th street to 127th street, deeded to defendant a strip of land 24 feet wide along the center line of 4th avenue, from the south side of 124th street to 127th street, with power of sloping the embankments or excavations so far as may be necessary to support the work, not, however, extending beyond the width of the avenue. By act of legislature passed in 1837 (Laws 1837, c. 274), 4th avenue was widened from 100 feet to 140 feet, a strip of 20 feet being taken from each side, and added to the street. About 1850 the city of New York instituted proceedings, pursuant to Laws 1813, c. 86, and its amendments, to acquire 4th (now Park) avenue, from 38th street to the north side of 135th street. The strip of land in the center of the avenue, owned by defendant, was conveyed to the city for a nominal sum, which conveyance, however, did not affect the rights of defendant in the use and occupation of the street. In 1872 the legislature passed an act (Laws 1872, c. 702) which provided for the removal of grade crossings of defendant railroad, and required them to be constructed either above or below grade, according to plans to be adopted for that purpose, and authorized defendant to construct four tracks instead of two, and to take such additional space as might be necessary for that purpose. For the distance of several blocks both north and south of 124th street, the tracks were depressed in a cut about 15 feet deep, about 50 feet wide at the bottom, and 61 feet and 8 inches at the top. Parapets and railings were surmounted on the sidewalks, which concealed passing trains from view in the street. The cut was crossed by means of bridges at 124th street and at a number of streets both north and south thereof. Trains were run in this cut from 1874 to February 16, 1897, without interruption. In 1890 an act of congress was passed (Laws 1890, c. 907) directing the secretary of war to cause all bridges then crossing the Harlem river to be replaced by other bridges, placed at a height of 24 feet above the high water of spring tides. It became necessary to change the grade of defendant railroad as far south as 125th street, which change was provided for by an act of the legislature. By act of 1893 defendant or its lessee could elect to build a station at 125th street, with platforms extending from the north line of 124th street to the south line of 126th street. The station and platforms were to rest on an iron or steel viaduct, extending from curb to curb on Park avenue, its extreme width being 114 feet and 4 inches. The erection of a station was commenced at 125th street. It consisted of four buildings running longitudinally with the tracks on either side of and between the same. The platform extended south beyond the north line of 124th street, which was a violation of Laws 1892, c. 339, § 7. On a preliminary injunction being asked, this work was abandoned. Laws 1896, c. 594, amending section 7 of the original act, directed the company to erect a station at 125th street, and directed the viaduct to be narrowed to 82 feet. This work was to be done at the expense of the railroad company. On June 20, 1896, the company entered into a contract with the Elmira Bridge Company, Limited, to take down so much of the viaduct as was necessary to make it conform to the plans adopted under Laws 1896, c. 594. On August 18, 1896, the company also contracted with Levering & Garrigues for the building of a station at 124th street, who thereupon erected the station as it now exists. The work on the first and unlawful

station and the subsequent work in cutting down the viaduct created much more noise than would have been caused in the mere erection of the viaduct. While the viaduct was being constructed, the trains were run in the depressed cut, on each side of which a temporary structure was erected, which, together with the permanent structure, increased the smoke, gas, soot, and cinders, which were blown into the stores and dwellings in plaintiff's buildings. The sidewalks and streets adjacent to plaintiff's buildings were torn up, and occupied with building materials, which interfered with access to plaintiff's property. The viaduct is now completed, and trains have been running thereon since February 16, 1897. The cut in Park avenue is filled up, and the street paved from side to side. The viaduct has been cut down from 114 feet to 82 feet.

Thomas P. Wickes, for plaintiff.

Ira A. Place and A. S. Lyman, for defendants.

WERNER, J. It is conceded that Isaac Adriance is the common source of title herein. The New York & Harlem Railroad Company took its title directly from him on the 18th of January, 1832. The plaintiff acquired his title January 29, 1883. The lands described in his deed are situated on the northwesterly corner of Park avenue and 124th street, fronting 100 feet and 11 inches on said avenue and 89 feet and 7 inches on said street. The whole of the frontage on Park avenue and about 70 feet in depth on 124th street is occupied by two four-story brick and stone store and apartment houses, numbered 1800, 1802, 1804, and 1806 Park avenue, respectively. There are four stores, with apartments above them. Nos. 1800 and 1802 are 60 feet in depth and Nos. 1804 and 1806 are 70 feet in depth. The price paid by the plaintiff for the land was $28,000, and the cost of the buildings was $76,000. The plaintiff's own residence, which is excluded from consideration upon this trial, occupies a frontage of 20 feet on 124th street in the rear of said land, and, according to the testimony of the expert Bierhoff, $4,800 should be deducted from the total purchase price of the land to ascertain the purchase price of that part which fronts on Park avenue. The total original cost of the land and buildings in suit was, therefore, $99,200. At the time these buildings were erected they were among the best in that section, and they have always been kept in good repair. Since that time there has been a remarkable growth of population in that section, which has resulted in the rapid and large increase of apartment houses equipped with more modern conveniences, and in consequence thereof there has been greater competition and a natural reduction in rents. It is upon such a state of facts that the plaintiff seeks relief by injunction, and damages for the alleged injury to his property by reason of the maintenance and operation of the defendant railroad in front of his premises under the conditions above described.

The first question to be determined is to what extent the plaintiff is foreclosed from seeking such relief, either by his own acts or by the decisions of the higher courts in cases involving the same questions. It seems clear that under the rule laid down in the Conabeer, Birrell, Taylor, and Welde Cases against these railroad defendants (Conabeer v. New York Cent. & H. R. R. Co. [Sup.] 32 N. Y. Supp. 6; Birrell v. New York & H. R. R. Co. [Sup.] 58 N. Y. Supp. 650; Tay-

lor v. Same [Sup.] 50 N. Y. Supp. 697; Welde v. Same [Sup.] 51 N.
Y. Supp. 290), the plaintiff cannot recover for any use of Park avenue
for railroad purposes which was contemplated in the deed from
Adriance to the New York & Harlem Railroad Company. It must
be deemed settled, therefore, that as to the 24 feet in the center
of Park avenue, originally granted to the railroad company, the lat-
ter acquired the right to construct, maintain, and operate its rail-
road at any grade fixed by the legislature. Under the act of 1872,
however, the railroad company assumed to take lands for the con-
struction and maintenance of two additional tracks, which increased
the width of the strip occupied by it in front of the plaintiff's prem-
ises from .26 to 61 feet. This was after the city had acquired the
naked legal title to all the lands in Park avenue. The title of the
city was, however, subordinate not only to the then existing rights
of the railroad company, but to the easements in said street of the
abutting owners. To the extent that the occupation and use by the
railroad company of the additional lands in Park avenue created a
burden upon the abutting lands in excess of that which was con-
templated by the original grant, it created a right of action in favor
of the abutting owners. But the plaintiff purchased his land after
the changes of 1872 had been made, and, as stated in the Conabeer
Case, with knowledge of the conditions, and with constructive no-
tice of defendants' rights he made a purchase which presumably
included all proper deductions from the value of his land by reason
of the presence of the defendants' railroad. The plaintiff and his
predecessors in title, moreover, permitted the defendants to con-
tinue in their use and occupation of Park avenue, under the act of
1872, without complaint or interference, until the commencement
of this action. Under the doctrine of the Taylor Case, 27 App.
Div. 197, 50 N. Y. Supp. 697, this protects the defendant railroads
in their claim of adverse possession to the extent of their user for
a period of more than 20 years. The plaintiff contends, however,
that, admitting all this, the construction, maintenance, and use of
the present viaduct structure is not within the contemplated use
provided for in the original grant, and is clearly an enlargement
of the user, which has ripened into adverse possession. This is un-
doubtedly true. Mr. Justice Rumsey's language in the opinion in
this case upon appeal leaves no room for doubt upon that point.
But it is equally clear from said opinion that there is no liability
on the part of the defendant railroad companies for the loss and
inconvenience which the plaintiff may have suffered during the period
of construction of said viaduct by reason thereof. It was a public
work, performed by a duly-constituted public body, in which the
defendants had only such an interest as the nature of their subse-
quent use of the contemplated structure, and their compulsory lia-
bility to pay for the same, in part at least, would render proper and
necessary. The attempt of plaintiff's learned counsel to change the
record of this case by showing that the defendants' engineers and
agents made claims and did acts which are apparently inconsistent
with the present attitude of the defendants was not successful. It
was quite natural, and to some extent perhaps necessary, that the

defendants should, in self-protection, make claims during the progress of the work which might indicate an intention to interfere with or direct the conduct of the "board of improvement," but for all legal purposes the latter and the railroads were separate and distinct legal entities, the latter having no legal control or direction of the work except as to certain portions thereof, which we shall consider further on. We must follow the Welde Case, 28 App. Div. 386, 51 N. Y. Supp. 290, upon the proposition that for the loss which the plaintiff may have sustained by reason of noise, loss of light, air, and access, consequent upon the building of the viaduct and the temporary structures used in the erection thereof, the defendants are not liable.

The next step in the logical investigation of this case is to consider to what extent, if any, the defendant railroad companies are liable for the injuries, if any, sustained by the plaintiff's property in consequence of the defendants' use of said viaduct structure since its completion. In this connection the terms of the deed from Adriance to the New York & Harlem Railroad Company play an important part. This deed clearly contemplated the possible use of an embankment upon which to base the right of way 24 feet in width. Such an embankment might, at its bases, occupy the whole of the width of the avenue, if necessary. But the right of way itself was only 24 feet in width, and this fact implies a slope of such character as to make the interference therefrom with the easements of light and air of the abutting owners a totally different thing from the interference with these same easements caused by a viaduct structure 82 feet in width, with perpendicular sides. After the widening of Park avenue, the occupation of the whole of the original street by the base of an embankment would still have left a greater area of light and air for the abutting lands than is left by the present structure. This is equally true, although not in the same degree, whether the defendants' right of way be limited to 24 feet or extended to 61 feet. It seems obvious, therefore, that in the use of this viaduct structure the defendant railroad companies to some extent invaded the plaintiff's right to the easements appurtenant to his freehold, and which were not affected by defendants' rights or use prior to 1897. The precise extent of this invasion it may be impossible to measure. But that is no reason why the plaintiff should be sent out of court remediless. If it clearly appears that by reason of defendants' use of said street in excess of the right which they have established the plaintiff has sustained damages, the court should not be turned aside in its pursuit of justice by the mere difficulty of admeasuring the loss or injury. Being satisfied, therefore, that the use of the viaduct structure, as it now exists, is an invasion of the plaintiff's rights to the extent that said structure and its use interfere in greater degree with the profitable use and enjoyment of the plaintiff's premises than did the defendants' railroad as they existed prior to 1892, it remains to make the attempt to admeasure such injury in dollars and cents. This will be done further on, in connection with another branch of the case which is yet to be considered. This second branch of the case has

to do with questions which arise out of work done directly by the New York Central & Hudson River Railroad Company, or pursuant to contract with it, as lessee of the New York & Harlem Railroad Company. Under the act of 1892 (section 7) said railroad company had the option to locate and maintain station houses on both sides of the railroad at 125th street, with platforms extending from the north line of 124th street to the south line of 126th street, with stairways at 124th street and at 125th street. Under the plans adopted, pursuant to said act, the viaduct was to be 114 feet in width, with supporting columns at the curb line in front of the plaintiff's premises. The railroad company exercised its option to locate and maintain a station at 125th street, and the viaduct was constructed of the width aforesaid with that purpose in view. It subsequently transpired that the platforms extended southerly beyond the south line of 124th street, and it is conceded that to that extent the structure was unauthorized and illegal. The only work done in the construction of a stairway on 124th street was in placing a foundation stone on the sidewalk adjacent to plaintiff's premises. Upon the issuance of a preliminary injunction herein, further work upon the stations and approaches was discontinued. To meet the difficulties presented by this situation, chapter 594 of the Laws of 1896 was enacted, amending section 7 of the act of 1892, and directing the railroad company to erect and maintain a station at 125th street, and for that purpose to erect and maintain a station building in Park avenue, extending from the north line of 125th street to the south line of 126th street, 40 feet in width, with suitable stairways at the easterly and westerly ends thereof. The viaduct structure was to be of sufficient width for the construction and maintenance of suitable platforms and station buildings between the tracks, and for the necessary approaches thereto, but not to exceed 82 feet in width, except that the cross girders to sustain such platforms, station buildings, and approaches may be supported on columns erected on the curb lines of Park avenue between 123d street and 127th street. Pursuant to the provisions of this act and the amended plans adopted thereunder, the railroad company, on the 20th day of June, 1896, entered into a contract with the Elmira Bridge Company, Limited, to take down so much of said viaduct structure as was necessary to make it conform to the amended plans. This involved the cutting of thousands of bolts riveted upon the first structure, and the riveting of thousands more upon the structure as changed. It also required the use of the street for the deposit of materials to be removed and to be used. The railroad company also, on the 18th day of August, 1896, entered into a contract with Levering & Garrigues to erect the station and platforms which are now used by the defendants. The work done under this contract occasioned additional noise, and interfered with the usual use of the street, through the deposit and handling of building materials thereon. The work illegally done upon the first station and its appurtenances and approaches, as well as the work of taking down a part of the original viaduct, and of rebuilding it in its present form, and the work of erecting the present station, with

its buildings, platforms, and approaches, was the work of the railroad company.

We see no reason why the different railroad companies are not liable for the injuries, if any, sustained by the plaintiff's property as a result of that work. To what extent, then, if any, has the freehold of plaintiff's property been permanently injured? That is a question which it is infinitely more difficult to answer than to propound. The perplexity which meets us on the threshold of this inquiry arises out of the impossibility of admeasuring, even to a reasonable certainty, the difference between the burden cast upon the plaintiff's land by the use contemplated in the Adriance deed, and incidentally by the difference between the present use and that upon which a claim of adverse possession is founded. The perplexity is augmented by the conflicting proof upon the course of fee values in that locality, as well as by the numerous considerations which need to be weighed in determining the effect of the present structure, and its use upon the adjacent lands. It is as clear that plaintiff's easements of light and air have been permanently reduced as that his easement of access has been increased by the building of the present railroad structure. Before its erection, the only means of communication between the two sides of Park avenue was over bridges at intersecting streets. Now the street is open across the entire width, and connects with the lateral streets at convenient grades. The light and air have, however, been seriously affected. The present structure is substantially on a level with the second floor of the buildings on Park avenue. The locomotives and cars of passing trains are as much higher. Trains to the number of between 450 and 500 pass daily. The structure itself, as well as these frequent trains, materially darken the stores and the second-story apartments. The smoke, cinders, and gases, although presumably the same in kind and volume as those emitted while the trains were operated in the depressed cut, must necessarily produce a different effect when discharged at an altitude 30 feet above the level of the street. The differing degrees of humidity and the constantly changing currents of wind make this an ever-varying quantity, but common sense is in accord with the evidence which asserts that the plaintiff's easements of light and air have been permanently injured. The figures of the experts upon the question of fee value vary so widely as to make them practically useless, except for the purpose of comparison. Thus we have, on the part of the plaintiff, testimony to the effect that, beginning with an investment of $99,200 in 1883, the value of plaintiff's property had increased to $120,000 in 1884, to $165,000 in 1892, and decreased to $99,000 in 1898; a total decrease from the highest valuation of $66,000. The defendants' real estate experts testified that the total value of plaintiff's property was, in 1884, $86,600; in 1892, $89,500; in 1898, $84,460. This wide divergence is explained, pro and con, by a variety of arguments, which we cannot discuss in detail. It is enough to say that it is obvious that the truth is probably to be found somewhere between these two extremes. There is no reason to doubt the plaintiff's statement that the buildings cost him $76,000. The buildings,

as such, did not increase in value with lapse of time. The increase in the value of the whole would, therefore, be represented by the increase in the value of the land. We think the evidence warrants the conclusion that there was an average increase in the value of the land of $5,000 per year from 1883 to 1892. Placing the building, up to 1892, at its original cost of $76,000, this would make a total value of $144,200 in 1892. In seeking to ascertain the depreciation in value, if any, after 1892, we must keep in mind not only the general depreciation in real estate which ensued at that time, as the result of business depression, but also the natural depreciation in value of these particular buildings in consequence of competition with more modern and desirable apartment buildings, which multiplied in great number in that section after 1892. There is quite as much divergence in the testimony of the experts as to the value of the buildings at the periods above stated. Plaintiff's experts place the value of the buildings in 1883 at $80,000, in 1892 at $85,000, in 1898 at $48,000. Defendants' experts give the values for the same periods as $56,000, $50,000, and $45,360, respectively. We think that, after making due allowance for the vested rights of the defendants under the Adriance deed, and under their user of the additional space in Park avenue under legislative and municipal sanction, and after taking into account both the natural rise and fall in real-estate values during the periods above mentioned, the evidence supports the conclusion that the additional burden placed upon the plaintiff's land by the defendants' use, since February 16, 1897, of the present viaduct structure, has caused a permanent injury to plaintiff's freehold to the extent of $15,000. Much of what has been said applies with equal force to the question of rental value. The same considerations which have influenced the course of fee values have affected, in greater or lesser degree, the course of rental values. The plaintiff's evidence tends to show that from 1884 to 1892 the rents amounted annually to $9,628. In considering this evidence we must not lose sight of the fact that the books in which the rental accounts were kept were destroyed in 1891, and that the statements from which the plaintiff's agents testified were made up from memory. It is worthy of notice, also, that there is no statement of rents for the year 1893. In 1894 the plaintiff collected rent to the amount of $6,250; in 1895, $5,087; in 1896, $4,038; in 1897, $3,415; in 1898, $3,417. These figures present a total loss in rentals from 1894 to 1898, both inclusive, of $25,932, or average yearly loss of $5,180.40. In the effort to ascertain how far, if at all, the railroad companies are responsible for this shrinkage, we are again confronted with the vested rights of said defendants, and with the history of real estate in that section. The railroad companies had the right to use 61 feet in the center of Park avenue for the operation of their railroad at any grade that might be fixed by the legislature and sanctioned by the municipal authorities. This contemplated use did not, however, give the railroad companies the right to use such a structure as the present one, nor, in any event, a structure 82 feet in width, with perpendicular sides, and supporting columns on the curb line of the street. Nor can

the railroad companies plead their vested rights and user in defense of injury to the rental value, caused by work done under contracts made directly with them. That the present structure renders the front apartments and stores somewhat less desirable than they were before the erection of the present structure is a self-evident fact. That the work done by the defendants in the erection of their station and in the changing of the viaduct created much additional noise and inconvenience is clearly established. But it is probably equally true that the plaintiff's buildings did not escape the general depression of 1893 to 1898. Neither can we assume that plaintiff's tenants were so much better than the average tenant that no allowance need be made for losses in rents not paid. Nor is there any doubt that the plaintiff has suffered somewhat in rental returns because of the increase in competition with other apartment houses and stores. There is in this regard, as we have said, the same speculative uncertainty as to the precise cause or causes which have operated to reduce rental values, and there is the same difficulty in ascertaining the extent to which any particular cause may have been operative as there is trying to measure the damage to the fee value. Upon the whole evidence relating to this branch of the case, we think that an allowance of $7,200 for rental damage will be sufficient, and yet not excessive. This is an average of $1,200 per year from 1893 to the time of the trial. But this allowance is not made upon the theory that there has been an average loss of $1,200 per year; on the contrary, we think that the loss must have been much less in 1893, 1897, and 1898 than it was in 1894, 1895, and 1896. It was in the last-named years that the work of erecting that part of the structure which was to be devoted to the station was done, and it was also in that period that the taking down of the original work and the building of the second station was commenced and completed. After taking into account the extent to which the railroad companies had the right to use Park avenue for their purposes, and the degree to which they were not responsible for the work which was done in the construction of the viaduct, and after having given the fullest consideration to the various agencies not in any wise connected with the railroad companies which may have affected the rental value of plaintiff's premises, we think that the sum stated is fair compensation for the loss of rentals sustained by the plaintiff by reason of the defendants' acts. We consider, therefore, by holding that the plaintiff is entitled to a decree giving the plaintiff an injunction as prayed for in the complaint, unless the defendant the New York & Harlem Railroad Company, or its lessee, the New York Central & Hudson River Railroad Company, within 60 days from the entry of judgment herein, pay to the plaintiff the sum of $22,200, upon the delivery of a release from the plaintiff conveying to said defendants the right to occupy and use Park avenue as against the plaintiff. Said sum is made up as follows: Rental damage, $7,200; fee damage, $15,000; total, $22,200. Let judgment be entered accordingly.

Judgment accordingly.