MARY J. LEWIS, Appellant and Respondent, v. THE NEW YORK AND HARLEM RAILROAD COMPANY et al., Respondents and Appellants, Impleaded with the NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Defendant.

1. NEW YORK CITY — TITLE TO RAILROAD VIADUCT SITE IN PARK AVENUE — PRESUMPTION THAT OCCUPATION IS UNDER THE LEGAL TITLE. Where the owner of a tract of land in the city of New York conveyed in 1825 to the city the fee of an avenue, formerly known as Fourth, but now as Park avenue, for street purposes, reserving, however, the trees, buildings and improvements, which avenue had been mapped under chapter 115 of the Laws of 1807, by the city, as well as by

the owner, and had been laid down as a street in both maps, but had no actual existence as such until 1850–1853, and he assumed in 1832 to convey by deed a strip 24 feet wide through the center of the avenue to the New York and Harlem Railroad Company during its corporate existence, exclusively for railroad purposes, with the right to slope its embankment to the full width of the avenue, which was then 100 feet, which deed was not recorded until 1835, and of which the city had no actual or constructive notice until 1850–1853, when, upon the opening of the avenue, the corporation received a nominal award for its interest in the fee; and where the corporation had been given the right by the state and city to enter the avenue and use it for the sole purpose of a railroad and lay down its tracks on the said strip under conditions expressly assented to by the company, which gave the city supreme control, contained in two resolutions passed by the common council, one before and the other after its deed from the common grantor, and the latter reciting that the land to be entered upon was owned by the city, and where the corporation had expressly covenanted that it would remove its railroad from the street whenever the city required it, and thereafter entered and successive railroad viaducts were constructed on said strip, upon which it operated and has continued to operate its trains, neither the corporation nor its lessee can assert absolute title to the site of the viaducts, under claim of title exclusive of any other right, as against an abutting owner, who in 1895 acquired a lot upon the avenue between One Hundred and Fourteenth and One Hundred and Fifteenth streets, through *mesne* conveyances from the common grantor, prior to his grant to the railroad company, in an action brought by such owner to enjoin as an interference with the appurtenant easements of light, air and access, the operation of the railroad, and for damages, since, in the absence of any evidence as to character of the original entry by the corporation or the nature of its claim when or after entering, except as may be inferred from the above facts, its entry and occupation must be " deemed to have been made under and in subordination to the legal title " of the city.

2. Action in Equity by Abutting Owner — Measure of Damages. Where predecessors in the title have submitted without complaint to the maintenance by a railroad corporation, in the avenue in front of them, of two successive viaducts, each of which occupied its center for more than twenty years to the exclusion of all traffic therefrom, an abutting owner, who purchased, in 1895, while a third and higher viaduct was being constructed, under which the cross streets were carried, and who did not object to it until 1897, is not entitled, when suing in equity for damages to easements of light, air and access, to recover upon the same basis as if the avenue had never been a railroad street, but may recover only the net difference, measured in money, between the effect of the old structure and that of the new, during the period that the latter was in use, after deducting the benefits to access and traffic conferred by it, together with the usual injunction to enforce payment of the damages awarded.

3. EASEMENTS — TITLE BY PRESCRIPTION TO EXTENT OF USER. Where two successive railroad viaducts have each stood for more than twenty years, on lands definitely devoted to street purposes, in front of the premises of an abutting owner and her predecessors in the title, and have been used by the railroads continuously, visibly and exclusively, the corporations obtain, by prescription, as against the abutting owner and without liability at law, a right to maintain a viaduct forever within the same limits and at the same height, and, to the extent of the user, an exclusive right to the easements of light, air and access.

4. HIGHER VIADUCT ERECTED BY GOVERNMENTAL AGENCY — USE OF IT BY RAILROADS — TIME WHEN LIABILITY FOR DAMAGES BEGINS. Such corporations cannot be charged with the damages which the easements of an abutting owner suffered from the construction itself, by a governmental agency, of a third and higher viaduct; but where they use it, although by direction of the legislature, they are liable from the commencement of and during the period of such use after action brought, for such damages as the easements suffered from the increased height of the third viaduct, deducting, however, the benefits received from the increased facility of access afforded by the viaduct to the premises and in the locality.

5. TEMPORARY TRESTLES ENCROACHING ON AND CLOSING AVENUE — DAMAGES FOR USE OF THEM BY RAILROADS. Where the governmental agency, in constructing the third viaduct, erected temporary trestles, which lay outside of the lines of the former viaducts and substantially closed the avenue to traffic, and the corporations used them, although directed to do so by law, they are absolutely liable, without any deduction, for the damages which the easements of the abutting owner suffered during the period of such use.

6. ABANDONMENT OF PRESCRIPTIVE RIGHT TO MAINTAIN VIADUCT. Where railroad corporations have a prescriptive right to maintain in an avenue, a viaduct, its removal by a governmental agency affords no evidence that the corporations intend to abandon their prescriptive right, nor is evidence of such intent afforded by the mere fact that such a viaduct was removed and a similar one immediately constructed upon the same site.

7. NEW YORK CITY — EFFECT OF FOURTH AVENUE CONDEMNATION PROCEEDINGS IN 1850–1853. The condemnation proceedings of 1850–1853, by which Fourth avenue, in the city of New York, was widened, created no new easements for abutting owners, so far as the original width of the avenue was concerned.

*Lewis* v. *N. Y. & H. R. R. Co.*, 40 App. Div. 343, affirmed.

(Argued January 25, 1900; decided February 27, 1900.)

CROSS-APPEALS from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered

May 15, 1899, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

This action was brought to recover damages resulting from the operation of the defendants' railroad in front of plaintiff's premises on Park avenue, in the city of New York, and to enjoin the future operation of said railroad.

On the first of February, 1895, the plaintiff became the owner of a lot of land on the easterly side of Park, formerly Fourth, avenue, between 114th and 115th streets, in the city of New York, twenty-five feet wide and eighty feet deep. Upon this lot there is a five-story building known as No. 1613 Park avenue, the ground floor of which is used for stores, and the other floors for apartments.  She derived her title to said premises through various mesne conveyances from one Benjamin L. Benson, who is the common source of title of all the parties to the controversy.  On the 19th of April, 1897, she commenced this action against the defendants for an injunction and damages on account of railroad structures erected and maintained in said avenue, which, as she alleged, interfered with access to her premises and prevented light and air from reaching the same.

In 1811 Park avenue was laid out as a street, 100 feet wide, under the name of Fourth avenue, upon a map filed by commissioners appointed pursuant to chapter 115 of the Laws of 1807, but for many years it had no existence except on paper. Said act made the map "in respect to the laying out of streets and roads within the boundaries" specified, final and conclusive, both upon the city and the landowners.  It provided for the opening of any street so laid out upon the map whenever the city authorities decided to do so.

On the 19th of November, 1825, by a deed recorded December 6th of the same year, said Benson, who owned a large tract of farming land bounded by 107th and 115th streets and Third and Fourth avenues, conveyed to the city of New York the fee of Fourth avenue as laid out on said map, so far as it extended through his premises, including the portion in front of the lot now owned by the plaintiff, in trust

for street purposes, reserving the timber, trees, buildings and improvements standing thereon, and covenanting with all convenient speed to open said avenue over the lands conveyed and make it passable for "horses, carriages, cattle and foot passengers in the same manner and with the same degree of convenience as good country roads are passable." It does not appear that this covenant was ever performed by him, or that the street was actually opened until after 1850.

On the 12th of November, 1828, Benson caused a map of his tract to be filed in the register's office, upon which various lots were laid out, numbered and represented as lying on the easterly side of Fourth avenue. On the same day, by a deed recorded forthwith, he conveyed to one Watt, a predecessor in title of the plaintiff, the premises now belonging to her, with other lands, described by the lot numbers of said map and as bounded by the easterly exterior line of Fourth avenue.

The New York & Harlem Railroad Company was incorporated by chapter 263 of the Laws of 1831, and authorized "to construct a single or double railroad or way, from any point on the north bounds of Twenty-third street, to any point on the Harlaem River, between the east bounds of the Third Avenue and the west bounds of the Eighth Avenue," but in case the route should be located "in or along any public street or avenue now laid out on the map or plan of the city of New York," the company was required to "leave sufficient space in the said street or avenue on each side of the said railroad for a public highway for carriages, and for a sidewalk for foot passengers." The right was reserved to alter, amend or repeal the act at any time. The location of the route was not to be effective until a map thereof was approved by the common council. That approval was given on the 19th of December, 1831, by a resolution authorizing the company to construct a double or single-track railroad, not exceeding twenty-four feet in width, along Fourth avenue from Twenty-third street to the Harlem river, with the right, however, reserved to the city, in case "the railways or any part thereof shall constitute an obstruction or impedi-

ment to the future regulation of the city, or the ordinary use of any street or avenue," of which the city was to be the sole judge, to require the company to forthwith provide a remedy for the same, and in case of its failure to do so within one month after such requisition, to require it to remove the railway and replace the street in as good condition as it was before the railway was laid down. In case the company neglected to obey, the city was given the right to remove the obstruction from the street and restore it to its former condition at the expense of the company. It was further provided that "the railroad path" should be protected by railings, and that if the railroad should be discontinued "the strip of land to be taken for the said railroad should be thrown open and become a part of the street." This resolution was embodied in a formal agreement, duly executed by the company. On the first of February, 1832, the common council, by resolution, authorized the company "to take possession of the ground owned by the common council over which the line of said railroad is ordered to be constructed, and that they be permitted to use the same" for railroad purposes only.

On the 18th of January, 1832, Benson conveyed to the company a central strip of land twenty-four feet wide, extending from 105th to 116th street, "being part of one of the avenues laid out on the map of the city of New York as the 4th avenue   *   *   *   for and during the full period of time" that it should remain a corporation, "and on which they are to construct their railroad and for no other purpose, with the power of sloping their embankments or excavations so much farther beyond the line of said premises   *   *   *   as may be necessary to support their work, not, however, extending beyond the width of the avenue," which was then one hundred feet. This deed was recorded August 18th, 1835, but prior thereto the company had constructed a double-track railroad in the center of the avenue, on a stone viaduct, about twenty-eight feet wide at the base, with sloping walls, which, in front of the premises in question, were ten or twelve feet high.

In 1835 an effort was made to widen Fourth avenue to 140 feet, mainly because of the railroad in the center thereof. After action by the common council, upon the petitions of citizens and landowners interested, it was provided by chapter 274 of the Laws of 1837, entitled "An act to alter the map or plan of the city of New York," that "Fourth Avenue" should "be continued and extended on the said map or plan from 66th street to 68th street," and that "all that part of the Fourth avenue * * * lying between 34th street and the Harlaem river shall be widened on the map or plan of the said city by adding thereto, on each side thereof, twenty feet of land, so as to make the whole width of that part of the said avenue 140 feet." The portion so to be widened was declared to be one of the avenues of the city, with the like effect as if it had been laid out under the act of 1807. Said act of 1837 discontinued parts of eight streets, and assumed that Fourth avenue was not yet opened, for it provided that "whenever the said avenues or streets, or any or either of them, shall be opened, the damage and benefit shall be estimated, assessed and paid in like manner as the same would have been done if the said avenues or streets had been originally so extended or continued."

Between 1850 and 1853 Fourth avenue was opened from 38th street to 135th, the additional twenty feet on each side having been condemned and a nominal award of one dollar made to the railroad company, but its possession of the central portion of the street was never disturbed, and the part then occupied by the company was never used as a public street until after 1892. There is no evidence that any part of the avenue in the vicinity of plaintiff's premises was ever built upon or used by teams until after 1850.

By chapter 702 of the Laws of 1872 said company was "authorized and required to regulate the grade of their railroad in the Fourth Avenue," and to make numerous changes by way of viaducts, bridges and tunnels in order to do away with grade crossings. Four tracks were authorized, and the grade was depressed a part of the way so that the tracks ran

through a cut, but in front of the premises now belonging to the plaintiff a viaduct was required, which resulted in the construction of a solid stone embankment 56 feet 4 inches wide and 3 feet high, with a wall on each side extending up 3 feet and 10 inches farther. These changes were made by a board of engineers named in the act, who were required " to execute, direct and superintend the construction of the said improvement," and " take the entire charge and control " thereof. The cost of the improvement was to be paid by the railroad company and the city in equal proportions. The city officers were forbidden to obstruct the work ; the municipal legislature was required to pass such ordinances as were necessary to facilitate the same, and the company was " authorized and directed to run " its trains over the structure " when completed."

This improvement was finished about 1873, as the trial court is presumed to have found, and during that year said company leased its railroad in Fourth, now Park avenue, to the New York Central & Hudson River Railroad Company for a term of 401 years, and the latter company has operated the same ever since.

In 1890 an act of Congress required the secretary of war " to cause the low bridges now crossing said Harlem river to be replaced by other bridges at the expense of the owners thereof, as soon as the necessary legislation, if any such legislation be necessary, shall have enabled the change in grade to the approaches of said bridges thus required to be made." (26 U. S. Stat. at Large, 437.) In order to conform to this act no change of grade was required south of 125th street. In 1892 an act was passed, known as chapter 339, " to regulate, improve and enlarge Park Avenue ; " " to provide for the passage of intersecting streets under the railroad structure of the New York & Harlem Railroad Company ; " " for the elevation of said railroad structure ; " " for changing the grade of said railroad ; " " for the construction of a new railroad bridge at an increased elevation over the Harlem River. * * * and for other purposes." From the south

27

side of 111th street to the river the railroad tracks were required to be carried on a viaduct of iron consisting of three lines of plate girders, supported by steel columns standing on suitable pedestals of masonry, with proper foundations. The structure was to be so built that all streets from 112th to the Harlem river should be passed over with a clear height of not less than 14 feet above the surface of the pavement. Various cross streets, including those nearest to the plaintiff's property, which did not then cross the railroad, were required to be opened, regulated and paved, and to pass under the viaduct. Three supporting columns were to divide the structure into spans of about sixty-five feet, with one column in the center and another on each side at a distance not exceeding 28 feet. The columns were not to be more than 24 inches through, which was to be their "extreme external diameter above the level of the street pavement." The railroad tracks, four being authorized, were to be carried on a solid, tight, iron floor, and the drainage water conducted by pipes into sewers. Many other changes were required, during the making of which temporary structures were authorized in the avenue for the operation of the railroad. All the work, including that last named, was to be done by a board appointed by the mayor, which was directed to take the entire charge and control of the improvement, and to execute it in conformity with the act, one-half of the expense to be paid by the companies and the other half by the city, but the amount of the latter was to be assessed upon the property benefited. The defendants were "authorized and directed" to run their trains on the structure "when completed."

Pursuant to this act work was begun in August, 1894. The stone embankment was taken away and the viaduct constructed within the lines of the old structure, at a height above the street of about 35 feet and a width of 56 feet and 2 inches. The effect was to raise the trains high in the air and to remove the former obstruction from the avenue, which is now graded, paved and used as a street, 140 feet wide, with cross streets no longer cut in two. The whole avenue is open to traffic,

except where the columns stand, and all the lateral streets, including 114th and 115th, extend across without obstruction. While the permanent structure was in course of erection, provision was made by said board, pursuant to the act, for the running of trains by the erection of temporary trestles on each side of the old stone structure of 1872. These trestles were 3 feet high, about 13 feet 7 inches wide, and the total width of the old structure and the two trestles about $85\frac{1}{2}$ feet. They were built primarily for the operation of trains, and secondarily to aid in erecting the permanent structure. All the work of construction, both temporary and permanent, was done by the board appointed by the mayor, and neither defendant participated in the erection, or did anything, except in subordination to the board, which had exclusive control. The trains were transferred to the trestles in September, 1894, and were run thereon until February 16th, 1897, when they were removed to the new steel viaduct, upon which they have been operated ever since. The new structure, as compared with the old, confers no additional advantage upon the defendants. Between four and five hundred trains run over this structure every twenty-four hours, some of them in the night time, at from twenty to twenty-five miles an hour. The plaintiff purchased her lot while the work was in progress, and commenced this action shortly after the completion thereof.

The trial judge found that the defendants, by virtue of the various acts above named, the resolutions and action of the city, the Benson deed of January 18th, 1832, the street opening proceedings " commenced in 1850 and consummated in 1853, * * * and all acts of acceptance, user and occupation on the part of the defendant railroad companies, and the lapse of time and the acquiescence of the plaintiff or her predecessors in title, acquired the right, without liability to the plaintiff, to have, maintain and use their railroad and railroad structures as the same were maintained and used prior to August, 1894." He also found that " the rental and fee values of the plaintiff's premises were damaged by the work of constructing said permanent structure, and by the existence of the same prior to

said date (when the trains began to run thereon), but neither of the said defendants is liable for such damage. The said permanent structure and the operation of trains thereon are, and since February 16th, 1897, have been, a continuous trespass upon the plaintiff's easements of light and air, appurtenant to her said premises, and solely in consequence of said trespass, and aside from any other causes, the rental or usable value of said premises was depreciated from said date down to May 9th, 1898, in the sum of $100, below what said rental value would have been during said period, if there had been no change in defendant's said railroad in Park avenue in front of said premises, pursuant to chapter 339 of the Laws of 1892, and the fee value of said premises had been, and was on May 9th, 1898, depreciated in the sum of $750 below what said fee value would have been on said date if there had been no change in defendants' railroad as aforesaid. The said sums awarded as damages are over and above any and all benefits conferred upon said premises by the changes made pursuant to chapter 339 of the Laws of 1892, which said benefits result in part from improved access to said premises afforded by said changes, and in great measure offset the damages to said premises caused by said changes. The said sums awarded as damages are exclusive of any damages that would have been occasioned to plaintiff's premises by the maintenance and use of the defendants' railroad and structures, had there been no change in the same pursuant to chapter 339 of the Laws of 1892, for which last-mentioned damages, if any, the defendants are not responsible either jointly or severally." It was further found that " the existence of the temporary structure in front of plaintiff's premises, during said period, and the operation of trains thereon, deprived the plaintiff to a great extent of the light and air and access to which she was entitled, without any corresponding benefit, and the rental or usable value of her premises was damaged thereby in the sum of $600, which sum she is entitled to recover, with interest from February 16th, 1897 ; but the said defendant is liable for the presence and use of said temporary

structure  only  during  the  time  its  trains  were  operated.
thereon."

The  trial  court  held  that  the  defendants  were  not  liable
for the erection, maintenance or use of the old stone structure,
or for the  erection  of  the  new steel  or  temporary  wooden
structures, but that they were liable  for  the  actual  use  of the
temporary trestles  and for the  net  difference in the  effect of
using the old and the new structures, after taking into account
the increased facilities for access.   The liability of the defend-
ants was  thus  limited  to damages  caused  by the presence of
the temporary  and permanent structures, so long only as they
were in actual use by them.

From the usual  judgment entered accordingly both parties
appealed to the Appellate Division, where the judgment was
affirmed, one of the justices dissenting upon the ground that
the plaintiff  had sustained no permanent damage by reason
of the new erection, as the old structure was a greater detri-
ment to her premises than the new.   Both parties appealed to
this court.

*J. C. Bushby* and *L. M. Berkeley* for plaintiff, appellant
and respondent.   Park avenue, in front of the premises in
suit, was a public street prior to the defendants' entry into
the same.   (*Vail* v. *L. I. R. R. Co.*, 106 N. Y. 287; *Hughes*
v. *Bingham*, 135 N. Y. 352; *Kane* v. *N. Y. E. R. R. Co.*,
125 N. Y. 181; *Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 173;
*People* v.  *Kerr*, 27 N. Y. 199; *Ten Eyck* v. *Whitbeck*, 156
N. Y. 352; *Foster* v.  *B. S. Co.*, 47 Barb. 505; *Wilsey* v.
*Dennis*, 44 Barb. 359; *Fisher* v. *Hall*, 41 N. Y. 423; *Gil-
bert* v. *N. A. F. Ins. Co.*, 23 Wend. 43.)   The defendants
are estopped to deny that Park avenue, in front of the prem-
ises in suit, was a public street at the time of their entry into
the same.   The deed on which the defendants rely recognizes
the existence of  Park avenue  as  a  public street, and admits
that the strip on which their railroad is constructed is a part
of said street.   (*Vil. of  Olean* v.  *Steyner*, 135 N. Y. 345;
*Hennessy* v. *Murdock*, 137 N. Y. 317; *Lord* v. *Atkins*, 138.

.N. Y. 190; *Child* v. *Chappell,* 9 N. Y. 256; 20 Am. & Eng. Ency. of Law, 461; *Hardenburgh* v. *Lakin,* 47 N. Y. 111; *Jackson* v. *Parkhurst,* 9 Wend. 209; *Cobb* v. *Oldfield,* 151 Ill. 541; *Smith* v. *Young,* 160 Ill. 174; *Despain* v. *Wagner,* 163 Ill. 600; *Haight* v. *Littlefield,* 147 N. Y. 341.) The plaintiff has easements of light, air and access in Park avenue, unless those easements have been lost in some way. *(Lahr* v. *M. E. Ry. Co.,* 104 N. Y. 289, 290; *Abendroth* v. *M. Ry. Co.,* 122 N. Y. 14; *Kane* v. *N. Y. E. R. R. Co.,* 125 N. Y. 180.) The plaintiff's easements in Park avenue have not been lost by any acts of the legislature nor of the city of New York. *(Story* v. *N. Y. E. R. R. Co.,* 90 N. Y. 146; *Lahr* v. *M. E. Ry. Co.,* 104 N. Y. 288; *Pond* v. *M. E. Ry. Co.,* 112 N. Y. 188; *Shepard* v. *M. Ry. Co.,* 117 N. Y. 448; *Abendroth* v. *M. Ry. Co.,* 122 N. Y. 17; *Kane* v. *N. Y. E. R. R. Co.,* 125 N. Y. 176; *Matter of Mayor, etc., of N. Y.,* 99 N. Y. 577; Cooley on Const. Lim. [6th ed.] 222; *D., L. & W. R. R. Co.* v. *City of Buffalo,* 158 N. Y. 273; *Potter* v. *Collis,* 156 N. Y. 30.) The plaintiff's easements in Park avenue have not been lost by the deed from Benson to the New York and Harlem Railroad Company. *(Blackman* v. *Striker,* 142 N. Y. 560; *Perrin* v. *N. Y. C. R. R. Co.,* 36 N. Y. 120; *Bissell* v. *N. Y. C. R. R. Co.,* 23 N. Y. 61; *Hennessy* v. *Murdock,* 137 N. Y. 323; *Mott* v. *Mott,* 68 N. Y. 252; *Matter of Ladue,* 118 N. Y. 219; *Albert* v. *Thomas,* 73 Md. 181; *Kernochan* v. *N. Y. E. R. R. Co.,* 128 N. Y. 568; *Pappenheim* v. *M. E. Ry. Co.,* 128 N. Y. 437.) The plaintiff's easements in Park avenue have not been lost by reason of the fact that she purchased with notice of the existence of the defendants' railroad. *(Sterry* v. *N. Y. E. R. R. Co.,* 129 N. Y. 619; *Kernochan* v. *N. Y. E. R. R. Co.,* 128 N. Y. 568; *Pegram* v. *M. E. Ry. Co.,* 147 N. Y. 146; *Foote* v. *M. E. Ry. Co.,* 147 N. Y. 374.) The plaintiff's easements in Park avenue have not been lost by non-user or abandonment, nor by *laches,* acquiescence or adverse possession. *(Conabeer* v. *N. Y. C. & H. R. R. R. Co.,* 156 N. Y. 484; *Hughes* v. *M. E. Ry. Co.,* 130 N. Y. 26; *Hennessy* v. *Murdock,* 137 N. Y. 326; *People*

v. *Maher*, 141 N. Y. 336; *Cox* v. *Stokes*, 156 N. Y. 511; Code Civ. Pro. § 369; *Baker* v. *Oakwood*, 123 N. Y. 16; *A. B. N. Co.* v. *N. Y. E. R. R. Co.*, 129 N. Y. 260, 266.) The possession of the defendants in Park avenue has been under a license from the city, and, hence, not adverse. (*D., L. & W. R. R. Co.* v. *City of Buffalo*, 158 N. Y. 273; *Potter* v. *Collis*, 156 N. Y. 30; *People* v. *Kerr*, 27 N. Y. 211; *Milhau* v. *Sharp*, 27 N. Y. 622; *Trustees* v. *Jessup*, 10 App. Div. 458; *St. V. O. Asylum* v. *City of Troy*, 76 N. Y. 108; *Pierrepont* v. *Barnard*, 6 N. Y. 288; *White* v. *M. Ry. Co.*, 139 N. Y. 24, 25; *Wiseman* v. *Lucksinger*, 84 N. Y. 44; *Babcock* v. *Utter*, 1 Abb. Ct. App. Dec. 37; 1 Am. & Eng. Ency. of Law [2d ed.], 794; *H. R. T. Co.* v. *W. T. & Ry. Co.*, 135 N. Y. 407.) Title to a portion of a public street cannot be obtained by adverse possession. (*Burbank* v. *Fay*, 65 N. Y. 69; *St. V. O. Asylum* v. *City of Troy*, 76 N. Y. 114; *Bliss* v. *Johnson*, 94 N. Y. 241; *Driggs* v. *Phillips*, 103 N. Y. 82; *Webb* v. *Demopolis*, 95 Ala. 134; *Harn* v. *Dadeville*, 100 Ala. 199; *Hoadley* v. *San Francisco*, 50 Cal. 275; *Visalia* v. *Jacob*, 65 Cal. 434; *San Leandro* v. *Le Breton*, 72 Cal. 177; *Ames* v. *San Diego*, 100 Cal. 394.) The defendants are estopped from setting up any adverse possession in Park avenue. (*Vil. of Olean* v. *Steyner*, 135 N. Y. 346; *Bridges* v. *Wyckoff*, 67 N. Y. 130.) The defendants have not shown that they entered into the possession of Park avenue under claim of title, exclusive of any other right. (*Heller* v. *Cohen*, 154 N. Y. 311; *Doherty* v. *Matsell*, 119 N. Y. 648; Code Civ. Pro. § 368; *Thompson* v. *Burhans*, 79 N. Y. 99; *Bliss* v. *Johnson*, 94 N. Y. 242; *Wright* v. *S., O. & N. Y. R. R. Co.*, 92 Hun, 32; *Archibald* v. *N. Y. C. & H. R. R. R. Co.*, 157 N. Y. 582; *De Lancey* v. *Piepgras*, 138 N. Y. 46; *Stevens* v. *Hauser*, 39 N. Y. 302; *Jackson* v. *Sharp*, 9 Johns. 167.) The court will not presume a grant to the defendants of any portion of the bed of Park avenue. (*Burbank* v. *Fay*, 65 N. Y. 66, 67; *Donahue* v. *State*, 112 N. Y. 145; *K. I. Co.* v. *Shultz*, 116 N. Y. 388; *City of Quincy* v. *Jones*, 76 Ill. 242; *Mayor, etc.,* v. *Magnon*, 4

Mart. [La.] 9; *De Lancey* v. *Piepgras*, 138 N. Y. 46; *Roe* v. *Strong*, 107 N. Y. 359.) The plaintiff's easements in Park avenue have not been lost by prescription. (*Hughes* v. *M. E. Ry. Co.*, 130 N. Y. 26; Jones on Easements, § 573; *Uline* v. *N. Y. C. & H. R. R. R. Co.*, 101 N. Y. 106; *Marvin* v. *B. I. M. Co.*, 55 N. Y. 559; *Rhodes* v. *Whitehead*, 27 Tex. 316; *Taylor* v. *C., etc., R. Co.*, 83 Wis. 644; *Galway* v. *M. E. Ry. Co.*, 128 N. Y. 143; *Thomas* v. *Marshfield*, 13 Pick. 248; *Schmidt* v. *Draper*, 137 Ind. 249; *Ulman* v. *C. S. A. Co.*, 83 Md. 130; *Parker* v. *Framingham*, 8 Metc. 268.) The construction, maintenance and operation of the defendants' railroad structures in Park avenue constitute an invasion of the plaintiff's easements. (*Williams* v. *B. E. R. R. Co.*, 126 N. Y. 100; *Lahr* v. *M. E. Ry. Co.*, 104 N. Y. 288; *Story* v. *N. Y. E. R. R. Co.*, 90 N. Y. 168; *Kane* v. *N. Y. E. R. R. Co.*, 125 N. Y. 176; *Hill* v. *Mayor*, 139 N. Y. 495, 505; *Garvey* v. *L. I. R. R. Co.*, 159 N. Y. 332; *H. R. T. Co.* v. *W. T. & Ry. Co.*, 135 N. Y. 407.) The defendants are responsible for the construction, maintenance and operation of all the railroad structures in Park avenue. (*Beal* v. *Finch*, 11 N. Y. 136; *Creed* v. *Hartmann*, 29 N. Y. 597; *Roberts* v. *Johnson*, 58 N. Y. 616; *Wehle* v. *Butler*, 61 N. Y. 247; *Dyett* v. *Hyman*, 129 N. Y. 359; *People* v. *Hayes*, 7 How. Pr. 248; *People* v. *Nostrand*, 46 N. Y. 375; *People* v. *Comptroller*, 20 Wend. 595; *Stewart* v. *Wells*, 6 Barb. 79; *Kerr* v. *Mount*, 28 N. Y. 665.) The trial court adopted an erroneous measure of damages. (*Sperb* v. *M. E. Ry. Co.*, 117 N. Y. 162; *A. B. N. Co.* v. *N. Y. E. R. R. Co.*, 129 N. Y. 270; *Lahr* v. *M. E. Ry. Co.*, 104 N. Y. 268; *Hart* v. *Ten Eyck*, 2 Johns. Ch. 62; *People* v. *Mayor, etc.*, 4 N. Y. 419.)

*Henry G. Atwater* and *J. C. Thomson* for Alice I. Birrell and others, intervening. The owners of property abutting on Park avenue have easements in said avenue which are taken or impaired by the construction of the viaduct of the New York and Harlem railroad pursuant to the provisions of

Laws of 1892, chapter 339.   (*Taylor* v. *N. Y. & H. R. R. Co.*, 27 App. Div. 190; *Welde* v. *N. Y. & H. R. R. Co.*, 28 App. Div. 379; *Lewis* v. *N. Y. & H. R. R. Co.*, 40 App. Div. 343; *Birrell* v. *N. Y. & H. R. R. Co.*, 41 App. Div. 506; *R., H. & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.*, 110 N. Y. 128; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510; *P. W. W. Co.* v. *Bird*, 130 N. Y. 249; *People ex rel.* v. *Barnard*, 110 N. Y. 548; *People* v. *O'Brien*, 111 N. Y. 30; *H. R. T. Co.* v. *W. T. & Ry. Co.*, 135 N. Y. 393.)

*Ira A. Place, Samuel E. Williamson* and *Alexander S. Lyman* for defendants, respondents and appellants.   By virtue of the deed from Benjamin L. Benson, and more than twenty years' adverse possession claiming title under that deed, the railroad companies have acquired the right, as against the plaintiff, to maintain and operate the permanent railroad structures erected under chapter 339 of the Laws of 1892, and the amending act.   (*Conabeer* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 474; *Taylor* v. *N. Y. & H. R. R. Co.*, 27 App. Div. 190; *Prentice* v. *Geiger*, 74 N. Y. 341; *A. B. N. Co.* v. *N. Y. E. R. R. Co.*, 129 N. Y. 252; *Birrell* v. *N. Y. & H. R. R. Co.*, 41 App. Div. 506; *Sanders* v. *N. Y. & H. R. R. Co.*, 42 App. Div. 618; *Argotsinger* v. *Vines*, 82 N. Y. 308; *Thompson* v. *Burhans*, 79 N. Y. 93; *Jackson* v. *Vermilyea*, 6 Cow. 678; *Dominy* v. *Miller*, 33 Barb. 386.)   By virtue of the street opening proceedings consummated in 1853, the ownership of the bed of Park avenue acquired by the city, and the easements appurtenant to abutting property which came into existence by virtue of such proceedings, were subject not only to the right of the defendant, the New York and Harlem Railroad Company, to maintain and operate its railroad as then existing, but subject also to its right and obligation to maintain and operate within the limits of Park avenue its railroad at such grade and on such structures as might be required by subsequent lawful action of the legislature and of the city.   (*Taylor* v. *N. Y. & H. R. R. Co.*, 27 App. Div.

195.; *White* v. *M. Ry. Co.*, 139 N. Y. 19 ; *Lahr* v. *M. E. Ry. Co.*, 104. N. Y. 287 ; *Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend. 9 ; *S. R. T. Co.* v. *Mayor, etc.*, 128 N. Y. 510 ; *People* v. *Kerr*, 27 N. Y. 188 ; *Mayor, etc.*, v. *S. A. R. R. Co.*, 32 N. Y. 261 ; *People* v. *O'Brien*, 111 N. Y. 1 ; Mills on Em. Dom. [2d ed.] §§ 46, 47 ; *Matter of City of Buffalo*, 68 N. Y. 167 ; *People ex rel.* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 570.) Any damage caused to the plaintiff's premises by the operation of trains on the temporary structure during the progress of the improvement is *damnum absque injuria*. (*Fobes* v. *R., W. & O. R. R. Co.*, 121 N. Y. 505 ; *Sperb* v. *M. E. Ry. Co.*, 137 N. Y. 155 ; *Welde* v. *N. Y. & H. R. R. Co.*, 28 App. Div. 379 ; *Atwater* v. *Trustees of Canandaigua*, 124 N. Y. 602 ; *Benner* v. *A. D. Co.*, 134 N. Y. 156 ; *Plant* v. *L. I. R. R. Co.*, 10 Barb. 26 ; *Matter of Squire*, 125 N. Y. 131 ; *Ricket* v. *M. R. Co.*, L. R. [2 E. & I. App.] 175 ; *Booth* v. *R., W. & O. T. R. R. Co.*, 140 N. Y. 267 ; *Hill* v. *Mayor, etc.*, 139 N. Y. 495.) Defendants are not liable for the acts of the board for the Park avenue improvement, and assuming that any of the acts of that board constitute as a matter of law a trespass upon the plaintiff's premises, defendants were not so connected with such acts as to be made liable therefor. (*N. Y., N. H. & H. R. R. Co.* v. *Baker*, N. Y. L. J., Jan. 6, 1900 ; *Welde* v. *N. Y. & H. R. R. Co.*, 28 App. Div. 379 ; *People ex rel.* v. *Civil Service Bd.*, 41 Hun, 287 ; *S. P. & P. Assn.* v. *Mayor, etc.*, 8 App. Div. 230 ; Dillon on Mun. Corp. [4th ed.] § 974.)

Vann, J. The plaintiff claims that the trial court erred in refusing to allow her damages for the effect of the new structures, both temporary and permanent, without considering the effect of the old structure. The defendants claim that the court erred in awarding any damages, or giving any relief whatever, to the plaintiff, because, as against her, they had the right to erect any railroad structure in the street, of any height, within the lateral lines of the old embankment.

The defendants' appeal rests mainly upon the proposition

that, by virtue of the Benson deed to the Harlem Company, in 1832, and possession thereunder for more than twenty years under claim of title exclusive of any other right, the defendants acquired title to the land upon which the steel viaduct now stands. (Code Civ. Pro. § 369; *Baker* v. *Oakwood*, 123 N. Y. 16.)

The situation, when the Harlem Company entered Fourth avenue and took possession of the strip of twenty-four feet covered by the Benson deed, was as follows: The section had been mapped under the act of 1807, as well as by Benson, and Fourth avenue had been laid down on both maps as one of the streets of the city. Benson had conveyed the entire avenue to the city for street purposes, reserving certain rights, and after thus conveying to the city had assumed to convey said strip to the Harlem Company exclusively for railroad purposes, but the conveyance was effective only as to his reserved rights. After conveying to the city, but before conveying to the company, he had conveyed, by reference to said maps, certain abutting lands to the plaintiff's predecessor in title. The avenue was not opened or built upon, as such, but was a street on paper only. The state and city had given the Harlem road the right to enter the avenue and lay down tracks on said strip, subject to certain drastic conditions, which gave the city supreme control; and to which the company had expressly assented, and, finally, the city had authorized the company "to take possession of the ground owned by the" former and had ordered the latter to construct its road thereon, with leave to use the street for "the purpose of a railroad and for that purpose only." The situation differs from that considered by us in a late case, as Benson had conveyed the street to the city and the abutting land to plaintiff's predecessor before he conveyed to the company, whereas in that case the first conveyance was to the company itself. (*Conabeer* v. *N. Y. C. & H. R. R. R. Co.*, 156 N. Y. 474.)

There is no evidence as to the character of the original entry into the street by the Harlem Company, or the nature of its claim when or after entering, except as it may be

inferred from the facts above mentioned and the subsequent occupation and use for railroad purposes of a portion of the avenue, which was a street *in posse* only and did not become a street *in esse* until twenty years later. Under these circumstances the entry and occupation by the company must be "deemed to have been under and in subordination to the legal title" of the city. (Code Civ. Pro. § 368; Code Pro. § 81; 2 R. S. 293, § 8.) Occupation must not only be hostile in its inception, but it must continue hostile, and at all times, during the required period of twenty years, challenge the right of the true owner in order to found title by adverse possession upon it. The entry must be strictly adverse to the title of the rightful owner, for if the first possession is by permission it is presumed to so continue until the contrary appears. If the occupation begins with recognition of the real owner's estate it is presumed to be subservient, and that the one making the entry intends to hold honestly and not tortiously. The character of the possession depends on the intention with which entry is made and occupation continued. There is no *disseisin* until there is occupation with intention to claim title, and the fact of entry and the *quo animo* fix the character of the possession. The burden of proving all the facts necessary to constitute adverse possession is upon the one who asserts it, for in the absence of such proof possession is presumed to be in subordination to the true title. (*Brandt* v. *Ogden*, 1 Johns. 156; *Smith* v. *Burtis*, 6 Johns. 197; *Jackson* v. *Johnson*, 5 Cow. 74; *Jackson* v. *Brink*, 5 Cow. 483; *La Frombois* v. *Jackson*, 8 Cow. 589; *Humbert* v. *Rector, etc., of Trinity Church*, 24 Wend. 587; *St. Vincent Female Orphan Asylum* v. *City of Troy*, 76 N. Y. 108; *Doherty* v. *Matsell*, 119 N. Y. 646; *Kneller* v. *Lang*, 137 N. Y. 589; *DeLancey* v. *Piepgras*, 138 N. Y. 26; *Heller* v. *Cohen*, 154 N. Y. 299, 311; Tyler on Ejectment, 860; Buswell's Lim. & Ad. Poss. 380; Am. & Eng. Encyc. of Law [2nd ed.], 778.)

The entry by the Harlem Company was by the express permission of the city, under a resolution which recited that the

land entered upon was at the time owned by the city. The occupation was permissive from the outset, and, as there is no adequate evidence to the contrary, is presumed to have so continued ever since. The company recognized the title of the city by assenting to resolutions passed by the common council both before and after it accepted the deed from Benson. There was no open or notorious assertion of title under that deed, and no evidence of intention to claim title thereunder, except the deed itself, which was not recorded until after the railroad was built. There is no evidence that the city had notice, either actual or constructive, of that deed until the condemnation proceedings of 1850, when a nominal award was made to the company for its interest in the fee of the street. By an agreement duly executed under its seal, the company expressly covenanted that if permitted to occupy Fourth avenue, it would remove its railroad from the street whenever the city required it. It entered under a license and remained under a license. Its unbroken continuity of possession from that day to this has never been accompanied with the assertion of any claim hostile to the city, for its deed from Benson, under the circumstances, is no evidence of a hostile claim, but simply that it had acquired Benson's reserved rights, which cut no figure in this controversy. Possession to be effective must be hostile to the rightful owner, and if the company intended to base a claim upon its deed in hostility to the city, the circumstances required it to make the fact known to the city, as otherwise its possession is presumed to be in accordance with its agreement. (*Treadwell* v. *Inslee*, 120 N. Y. 458.) The city did not know that the company had repudiated its agreement and stood on the Benson deed, exclusive of any other right, if such were the fact. It did not know of the existence of that deed, for the record was no notice, as a landowner is not compelled by the Recording Act to watch the records for conveyances of his own property. To authorize the presumption of a grant, the enjoyment " must not only be uninterrupted for the period of twenty years, but it must be adverse, not by

leave or favor, but under a claim or assertion of right, and it must be with the knowledge and acquiescence of the owner." (*Flora* v. *Carbean*, 38 N. Y. 111; *Bedlow* v. *N. Y. F. Dry Dock Co.*, 112 N. Y. 263; *Parker* v. *Foote*, 19 Wend. 313.) When the occupant is in possession under two instruments, one subservient and the other hostile to the true owner, such possession, in the absence of positive notice to the contrary, will be regarded as subservient only, for the law raises a presumption in favor of an honest and against a dishonest purpose. This disposes of the appeal brought by the defendant, so far as it requires discussion apart from the claim of the plaintiff.

The plaintiff's appeal rests upon the proposition that she is entitled to the same relief that she would have been if there had been no railroad structure in the street prior to the erection of the steel viaduct. It would be sufficient to say in answer to this claim that as she asks aid from a court of equity, she can enforce her claim only so far as it is equitable, in the sense of being just. When she crosses the line of equity and good conscience to ask for compensation on the same basis as if Park avenue had never been a railroad street and seeks to recover damages which she has not suffered, on the ground of an alleged technical right, she must withdraw from a court of equity and seek relief at law. Since she or her predecessors submitted without complaint or question to the erection of two railroad structures in front of her property, each of which stood there for more than twenty years and wholly occupied the central portion of the street to the exclusion of all traffic therefrom, it would not be just to claim the same damages for injury to her easements by the third structure that she could properly have claimed if those easements had not been impaired by the previous structures. She has been awarded all that is equitably her due, which is the net difference, measured in money, between the effect of the old and the new structure, while in actual use, less the benefits conferred by the latter. She has also been granted an injunction to protect her hereafter, unless her permanent damages are paid upon

the same basis.  A court of equity will give her no further relief.

But we will not stop here, for we wish to place our decision upon grounds equally tenable .in either jurisdiction.  While the defendants acquired no right by adverse possession, as against the city, they acquired certain rights by prescription as against the abutting owner.

·The leading facts bearing upon the subject may be summarized as follows: The lands embraced within the lines of Fourth avenue, as originally laid out upon the maps of the city and of Benson, were, by various conveyances, resolutions of the common council and acts of the legislature, so devoted to street purposes that they could not lawfully be used for any inconsistent purpose.  (*Matter of Vil. of Olean* v. *Steyner*, 135 N. Y. 341, 345; *Lord* v. *Atkins*, 138 N. Y. 184, 191; *Haight* v. *Littlefield*, 147 N. Y. 338, 342.)  The easements of light, air and access, so far as they had any practical existence prior to 1853 when the avenue was opened, were encroached upon by the first railroad structure, which, in front of plaintiff's premises, was a solid embankment 28 feet wide at the bottom and 10 or 12 feet high, walled in with stone.  From 1853 until 1873, . when the first improvement required by statute was made, the avenue was open and used as a street on either side of the railroad structure in the center, which continued to encroach upon the easements of the abutting owners.  From 1873, when the embankment was converted into a viaduct 56 feet wide and 7 feet high in front of the *locus in quo* until 1894, when the last improvement required by statute was begun, the same encroachment continued.  As to the plaintiff. and her grantors there was an open, continuous and exclusive possession and enjoyment by the railroad company of the easements in question to the extent of the user during the periods named.

Prescription rests upon the presumption of a lost deed, after adverse use and enjoyment for twenty years, which has been adopted by the courts as the prescriptive period from analogy to the Statute of Limitations.  (*Woodruff* v. *Paddock*, 130

N. Y. 618, 624; *Snell* v. *Levitt*, 110 N. Y. 595; *Nicholls* v. *Wentworth*, 100 N. Y. 455; *Ward* v. *Warren*, 82 N. Y. 265; *Parker* v. *Foote*, 19 Wend. 309, 312; Goddard on Easements, 90; Washburn on Easements [4th ed.], 123; 19 Am. & Eng. Encyc. of Law, 7; Jones on Easements, § 160; Gerard on Titles, 745.) What the primary owner loses by his *laches* the other party gains by continued possession without question of his right. (*Campbell* v. *Holt*, 115 U. S. 620, 623.) The adverse use must be of the same character and duration as the adverse possession required to give title to real estate, which has already been considered. If the presumption as to a lost deed may be rebutted, still it presents a question of fact which, in this case, has been determined in favor of the defendants. The possession of the defendants was not subordinate to the plaintiff's title, nor permissive as to her, but openly hostile and necessarily known to be such, to her and her grantors, who made no objection until 1897. It was exclusive, definite and uninterrupted, for it absolutely excluded all from the part of the avenue occupied by the railroad structures. The obstruction was not out of view or knowledge, but in plain sight of the abutting owners, who, by making no objection, acquiesced in the situation. The question does not arise between the railroads and the city, which had consented in advance to the occupation, but between the railroads and the abutting owners, who had not so consented.

Under these circumstances the old structures had stood in the street so long that the railroads acquired a prescriptive right to have them stand there forever, so far as the plaintiff is concerned. The situation was the same in effect as if one of her grantors, while he owned her property, had conveyed to the defendants the right to permanently keep the stone viaduct where it stood and to use it indefinitely for railroad purposes. To the extent of the user by the companies the plaintiff, through the acquiescence of herself and her grantors, had parted with her rights when the present structure was erected. She could claim no damages on account of the old structure, so long as it stood there. She could claim no damages on

account of any new structure erected in the same place, within the same lines, and for the same purpose, which inflicted no more injury upon her property than the old. She could raise no question except such as she could have raised had she given a deed expressly assenting to the erection of the old structure. (*Conabeer Case, supra.*) Had the new structure been no higher than the old, in front of her property, none of her rights would have been invaded, and she would have been entitled to no relief. These views are not inconsistent with but are in accordance with the principles of a case relied upon by the plaintiff, where the defense of prescriptive right failed because the facts failed, as adverse user was not found to have existed for the requisite period. (*American Bank Note Co.* v. *N. Y. El. R. R. Co.*, 129 N. Y. 252.)

The reason why possession of the same structure was adverse to the plaintiff but not to the city, is that the former never consented to the occupation, except by acquiescence during the prescriptive period, while the latter consented to the occupation in advance, and renewed the consent by subsequent acts at frequent intervals, while the railroad company never gave notice, direct or indirect, that it claimed to occupy under its deed or otherwise than by the consent of the true owner.

Prescriptive rights, however, are measured by the user, and the defendants could make no further encroachment without liability. (*Prentice* v. *Geiger*, 74 N. Y. 341; *Baldwin* v. *Calkins*, 10 Wend. 169; *Bealey* v. *Shaw*, 6 East, 208; *Stiles* v. *Hooker*, 7 Cow. 266.) As was said by Judge ANDREWS in *Prentice* v. *Geiger* (*supra*): "The right is supposed to have had its origin in a grant, and the grant being lost, the user is the only evidence of the right granted, and as the presumption of a grant only exists where there has been an adverse, continuous and uninterrupted user, according to the nature of the easement claimed, for the period of twenty years, the prescriptive right is confined to the right as exercised for that period of time." The plaintiff, therefore, was entitled to

recover for the additional injury to her property so far as it was caused by the defendants.

We now reach the question whether the defendants were liable for any part of the damages caused by the effect of the steel viaduct while it was in process of construction.

That structure was not erected by the defendants but by the state, as appears from the facts already stated. South of 125th street it gave them no facilities which they did not have before. The stone structure of 1872 did away with grade crossings and gave them four tracks, and this is all they have now. The change of grade north of 125th street, in order to cross the Harlem river at the height required by the general government, has no bearing upon the change of grade south of that point. The defendants are liable for what they did, but not for what the state did. (*Atwater* v. *Trustees, etc.,* 124 N. Y. 602.) The state created a board of experts and required them to make the improvement for the benefit of the public, giving them absolute control with no right on the part of the defendants to let or hinder. The board made the plans and did the work, letting their own contracts, employing and discharging their own men, without supervision or interference by the companies, which did not and could not set the board in motion, for the want of power, if for no other reason. The change of grade in front of the plaintiff's premises was not only for a public purpose, but was wholly in the interest of the public and not for the benefit of the defendants who had no power to prevent it. They simply paid one-half of the expense by command of the statute, and, hence, under compulsion of law. They are not liable for the acts of the Park avenue board, which was not their agent, but a governmental agency of the state. (*Benner* v. *Atlantic Dredging Co.,* 134 N. Y. 156, and cases cited on page 162.) Their offer in advance to obey the statute did not affect its compulsive force, for obedience was their duty. As was tersely said in a late case, the railroad company " had no choice left to it. The state intervened and directed that a work, which it had the power to require to be done, should be done, not by the

railroad nor even by the city, but by an independent board in the creation of which the defendant had no voice, over whose selection of employees it had no control, with the discharge of whose functions it could not interfere and whose operations it was powerless to prevent." (*N. Y., N. H. & H. R. R.* v. *Baker*, 98 Fed. Rep. 694.)

When the work was completed, if the defendants had not used it, they clearly would have been under no liability to the plaintiff. This is a decisive test, not only as to the permanent structure, but also as to the temporary trestles, which were part of the same scheme of the legislature, acting under general power, as well as that reserved when it incorporated the Harlem Company. They were erected by the same board, in the same way and under the same authority, but for the double purpose of aiding in the principal work of the state, and at the same time affording temporary relief to the defendants in the operation of their trains. The statute "authorized and directed" the defendants to operate their trains on the structures "when completed." Accordingly they laid their tracks, at first on the trestle work, which they used for a short time, and then on the steel viaduct, which they have used ever since. In thus using the work of the state they doubtless accepted it as their own, but they accepted it as a completed structure, and did not thereby become parties to the process of construction. Their acceptance did not reach back and adopt the previous acts of the state, but the effect was the same as if they had purchased it from the state on the day they commenced to use it.

Thus we strike the time when the liability of the defendants began. When they commenced to use the steel viaduct they started a new trespass upon the rights of the abutting owners. While they had a prescriptive right to use a railroad structure standing in the same place and of the same height as the stone viaduct, which was about 7 feet, they had no right, as against the plaintiff, to use the steel viaduct, which reached upward 35 feet until it was on a level with the windows of her fourth story. The new structure, so far as it stood within the lines

of the old, was not a trespass, for it lessened instead of adding to the burden, but so far as it extended above the space which it had to occupy, it was a trespass, for which the defendants have properly been held liable during the time they used it. The trestle work, which stood wholly without the lines of the stone viaduct, was a trespass without mitigation, for it substantially closed the avenue and conferred no benefit whatever upon the adjacent property. As to that structure, the liability of the defendants was absolute during the period of user.

The permanent structure, however, was not an unmitigated trespass, for upon the surface of the street it was a great improvement upon the stone viaduct, which it displaced. Before the change was made Park avenue was virtually two streets, each 42 feet wide, separated by a solid and impassable embankment 56 feet in width. Now it is 140 feet wide, with no obstruction to traffic except the columns which support the elevated roadbed. Never before could the plaintiff, or her predecessors, cross the street in front of her property, or even cross by the nearest lateral streets. For the first time in the history of the avenue its central portion is open, paved and capable of being used as a street. A substantial benefit was thus conferred, which, in assessing the damages inflicted upon the owner's easements, when no part of his land is taken, should in justice and according to authority be regarded. The basis of assessment is the difference in value of the easements as they now are and as they were with the old, and before the new viaduct was erected. (*Newman* v. *M. E. Ry. Co.*, 118 N. Y. 618, 624; *Bohm* v. *M. E. Ry. Co.*, 129 N. Y. 576, 591; *Sutro* v. *M. Ry. Co.*, 137 N. Y. 593; *Bischoff* v. *N. Y. El. R. R. Co.*, 138 N. Y. 257.) The courts below followed this rule and held the defendants liable for the net difference only.

The claim that the defendants abandoned their prescriptive rights by removing the old structure cannot be sustained. The old structure was not removed by the defendants, but by the state, of its own motion and through an independent

agency created by itself.   Moreover, the removal of one railroad structure, followed immediately by the erection of another, in the same place and for the same purpose, is no evidence of an intent to abandon the prescriptive right to have a railroad structure in the street.   If the new structure had not been a greater burden than the old the plaintiff would have been entitled to no relief whatever.

The effect of the condemnation proceedings of 1850, which widened the avenue, created no new easements for the benefit of the plaintiff or her predecessors, so far as the original width of the avenue was concerned.   This was passed upon in the *Conabeer Case* (*supra*), and requires no discussion.

We have reached the conclusion that the learned trial judge awarded and withheld relief precisely as the law requires, and that his judgment should stand.   In reaching this conclusion we have been materially aided by the opinions delivered in the Supreme Court in this and other cases affecting the locality in question, although we have not adopted all of the grounds upon which that learned court proceeded to judgment.   (*Taylor* v. *N. Y. & H. R. R. Co.*, 27 App. Div. 190; *Welde* v. *N. Y. & H. R. R. Co.*, 28 App. Div. 379 and 29 Misc. Rep. 13; *Birrell* v. *N. Y. & H. R. R. Co.*, 41 App. Div. 506; *Sander* v. *N. Y. & H. R. R. Co.*, 42 App. Div. 618.)

We have decided the case before us and have not tried to decide other cases, which, although arising in the same section, rest upon different facts, and may be controlled by different principles of law.   While we have carefully read the argument presented by learned counsel in behalf of the intervenors, we have limited its effect, so far as we have followed it, to the facts of this case.

The judgment should be affirmed, but as both parties appealed, without costs to either as against the other.

Parker, Ch. J., Bartlett, Martin, Cullen and Werner, JJ., concur; Gray, J., not sitting.

Judgment affirmed.