RICHARD F. HARRISON and Others, Respondents, *v.* THE NEW YORK CENTRAL RAILROAD COMPANY and Others, Appellants.

Fourth Department, September 28, 1938.

184

*H. Duane Bruce* [*Hiscock, Cowie, Bruce & Lee* for the New York Central Railroad Company; *John H. Walrath*, special counsel for the Syracuse Grade Crossing Commission; *Truman H. Preston, County Attorney*, for the county of Onondaga], for the appellants.

*Benjamin E. Shove*, for the respondents.

CROSBY, J. Defendants, in the pursuit of a railroad grade crossing elimination project, in the city of Syracuse, under the authority of chapter 825 of the Laws of 1928, found it necessary to condemn certain lands of the plaintiffs. In the course of the condemnation proceeding the plaintiffs claimed that defendants needed, and, in fact had actually taken, more of plaintiffs' land than they were seeking to take and pay for in the condemnation proceeding. Plaintiffs also claimed that in addition to land, defendants were acquiring from plaintiffs certain valuable easements that were not included in the condemnation proceeding. The main question at issue centers in a dispute as to the location of the line between the lands owned by the railroad and the lands owned by plaintiffs.

The parties agreed that the best way to adjudicate the issue was to suspend the prosecution of the condemnation proceeding, and to have an action brought by plaintiffs against defendants for a

declaratory judgment determining the true location of the property line, and also determining whether or not defendants were depriving plaintiffs of any of their easements, of several different kinds, and if so, whether they should be condemned. They made a stipulation to that end, and this action resulted.

The land of plaintiffs is located on the southerly side of the railroad's property, and has upon it a large building with stores on the ground floor and apartments above. The northerly face of the building is substantially parallel with the center line of the railroad, which center line is a four-degree and thirty-minute curve, and plaintiffs' land is on the convex side of the curve.

The defendants claim that the plaintiffs' building, on its northerly side, occupies all the land that plaintiffs own, in fact that its fire escapes trespass upon the railroad property. Plaintiffs claim, and the court below has adjudged, that, in addition to the land occupied by plaintiffs' building, the plaintiffs own, of land claimed by the railroad, a strip substantially ten and one-half feet wide, the full width of plaintiffs' property. The judgment determines that, of this ten and one-half feet, the plaintiffs have the record title to about three and one-half feet (being the three and one-half feet nearest their building) and title by adverse possession to the other seven feet lying next northerly of the three and one-half feet.

The original judgment also determined that plaintiffs own " in fee simple by express grant and [also] by adverse possession " a further strip of land northerly of the ten and one-half feet already mentioned; but it has been stipulated that this determination was an error, and that plaintiffs claim, and are awarded, no land further northerly than the ten and one-half feet, and, by order, the judgment has been corrected in this respect.

The judgment also determines that defendants have appropriated two valuable easements belonging to plaintiffs, which must be included in the condemnation proceeding, viz.: (1) An easement of light, air and access, and (2) an easement, which plaintiffs have acquired, in the street on the westerly side of their building, by long use of a portion of the street under the sidewalk as a heating plant where boilers are located and coal is stored.

In the main, four problems arise on this appeal, and they will be considered in the order stated, viz.:

1. Have plaintiffs acquired, by adverse possession, title to the seven-foot strip of land hereinbefore mentioned?

2. Have plaintiffs any rights in the street, due to their use thereof, for a boiler room, for the deprivation of which defendants are bound to pay?

3. Have defendants taken or interfered with any easements of light, air and access belonging to plaintiffs, for which defendants ought to pay?

4. Have plaintiffs a good record title, by grant, of the aforementioned three and one-half-foot strip of land?

Another question also arises in connection with the third stated question, viz.: If defendants are taking, or interfering with, any of the easements of light, air and access belonging to plaintiffs, should defendants be compelled to condemn the same and pay the value thereof, or should an action be brought, or a claim made, for damages? This matter will be considered in the discussion of the third stated question.

1. Have plaintiffs acquired, by adverse possession, title to the (approximately) seven-foot strip of land?

In the year 1881 the West Shore railroad acquired its right of way through the city of Syracuse, and, among other lands, besides its present right of way, it acquired title to the land now owned by the plaintiffs, and involved in this action. On June 7, 1884, it deeded to Peter B. McLennan the land now owned by plaintiffs, on which Peter B. McLennan erected a building. That building burned, and the present building was erected in its place. The building's westerly side faces on James street, and its northerly side faces the railroad right of way with no public street intervening between the building and the railroad. The building was erected in 1892, and, at about that time, the then owner of the property constructed a cement sidewalk along the northerly side of the building, and, in part at least, upon the railroad's property. Successive owners of the property have continuously maintained and repaired that sidewalk down to the present time. The customers of the stores in plaintiffs' building have used the sidewalk, the public have used it, the railroad employees have used it. Doubtless the walk was constructed in order to make the stores on the northerly side of plaintiffs' block more desirable to prospective tenants, and, therefore, more profitable to the owners. The New York Central railroad now owns the West Shore property. Has it lost title to its property through the maintenance thereon of this sidewalk by plaintiffs and their predecessors in title? I think not.

At the time that McLennan received his deed of the premises in question he was acting as attorney for the West Shore railroad, his grantor. There is evidence in the record from which it should be found that he received from the railroad a license to build and maintain the sidewalk. And, if his possession and use began with permission of the railroad, such possession and use are presumed to continue under permission, until the contrary is shown. (*Hinkley* v.

*State of New York*, 234 N. Y. 309; *Lewis* v. *N. Y. & Harlem R. R. Co.*, 162 id. 202.)

These cases also hold that where one occupies land, not under color of title, one is presumed to occupy in subordination to the legal title.

There is evidence of defendants' witness John H. Ehrehart, who, at one time, was a construction engineer for the West Shore railroad, that McLennan sought permission from the railroad to build the sidewalk on the railroad lands, and to that end sought the aid of Ehrehart. The witness told of going to New York with McLennan to persuade one Ashbel Green, who was general counsel for the railroad, to secure for McLennan permission to build his sidewalk on the railroad's property. Then follows a very impressive array of letters passing between railroad officials, together with resolutions in corporate records, all tending to show that the permission was actually granted. (Exhibits 48-A, 49-A, 50, 51, 52, 53, 58 and 59.) In one of the letters from Mr. Green, the general counsel, to one Layng, general manager of the railroad, a reason is suggested why McLennan should be given permission to build his sidewalk on the railroad's property, namely, that it would offer a safe passage for pedestrians, passing from James street to Lock street, who otherwise would have to cross the railroad tracks twice, thereby increasing the danger of accidents and consequent claims against the railroad company. Witness Ehrehart's testimony is not disputed, and it is strongly corroborated by the letters and resolutions appearing in the old files of the West Shore railroad. There is also corroboration in a clause which McLennan used to insert in leases by which he rented stores on the side of his building facing the railroad. This clause was one to the effect that the lessor should suffer no " reduction in rent or damages   *   *   *   by reason of any change in the operation, grade or location of the West Shore Railroad or its tracks." It is at least likely that the clause was inserted in leases in view of the railroad's reservation of a right to revoke the sidewalk license at any time. The railroad's records show that such a condition was attached to the permission to build the sidewalk. The trial court admitted all this evidence of the old records of the railroad, and, in its decision, held the evidence inadmissible. I think it was admissible, and that it is decisive of the question now under discussion. (*Hamershlag* v. *Duryea*, 58 App. Div. 288; affd., 172 N. Y. 622. See, also, Civ. Prac. Act, § 374-a.)

Furthermore the trial court's findings Nos. 48, 49, 50 and 51 (of defendants' requested findings), which are supported by the evidence, are to the effect that the occupation of the sidewalk area, by plaintiffs and their predecessors in title, was not hostile to the railroad nor exclusive in any way, and that the railroad and its

employees used the walk during all the time it existed "in connection with the maintenance and upkeep of [its] line."

In several of our sister States it is held that "A railway company may not, by its voluntary act, alienate its right of way to private individuals, to be used for private purposes inconsistent with that for which the right of way was acquired. If it could do so, then it would be possible to condemn and take private property, ostensibly for a public purpose, and immediately convert it for a private purpose." (*Edholm* v. *Mo. Pac. R. R. Corp.*, 114 Neb. 845; 211 N. W. 206. See, also, *Southern Pacific Co.* v. *Hyatt*, 132 Cal. 240; 64 P. 272.)

There is much to be said for such a doctrine. The land, here claimed by plaintiffs by adverse possession, has once been dedicated to a public use. It should not ordinarily be diverted to the purpose of enriching one whose claim rests upon the assertion that he began as a trespasser.

However the courts in New York have not gone so far as to hold that title to railroad property can never be acquired by adverse possession. (*Eggler* v. *N. Y. C. R. R. Co.*, 207 App. Div. 120; *Hood* v. *N. Y. C. & H. R. R. R. Co.*, 163 id. 833; 164 id. 917; affd., 221 N. Y. 519.)

Nevertheless there are cases in New York that recognize the principle that, because of the free use that is habitually made of railroad properties by the public, it requires more definite and distinctive acts to establish adverse user of railroad property than would be required to establish adverse user of property devoted solely to private purposes. (*Concklin* v. *N. Y. C. & H. R. R. R. Co.*, 149 App. Div. 739; appeal dismissed, 207 N. Y. 752; *Lehigh & H. R. R. Co.* v. *Village of Warwick*, 164 App. Div. 55.)

In the instant case, in view of the findings of fact, 48 to 51, inclusive, and in view of the undisputed evidence showing that possession of the sidewalk area began as a result of a license granted by the railroad, we think that the elements necessary to show an adverse possession are lacking.

2. The next question is whether or not plaintiffs have acquired any property rights in the street, for which defendants should pay, due to plaintiffs' use thereof for a boiler room.

There is no proof in the case that the city of Syracuse ever granted the owners of the block in question any license to locate their boiler room in the public street. Mr. Howard, the architect who planned the block, testified that the building plans, showing the location of the boiler room in the street, were filed with some city department, he did not know which one. The most that could be inferred from that fact is that the city tacitly permitted the placing of the boiler

room in the street. Such permission is automatically revoked whenever the space is needed for a public improvement. It has even been held that where a city, by formal license, grants a property owner the privilege of extending his plant into the street, " At most it is a mere license to use a portion of the highway, or land under a highway, temporarily or until the space is required for the public. The city authorities would have no right to grant more than this, even should they attempt to do so." (*Matter of Low*, 233 N. Y. 334, citing cases.)

That case also holds that, even though the property owner had been granted a written license to extend his vault under the street, he acquired no right for the deprivation of which he could collect damages. In that case the Rapid Transit Act for the city of New York authorized the use of the streets for building a subway — not an ordinary street purpose. In the instant case the Syracuse Grade Crossing Act authorized, in the same way, the taking, closing and altering of streets for the grade crossing improvement.

We conclude that plaintiffs are not entitled to compensation for the taking of any portion of their boiler room located in the street.

3. The next question is whether or not defendants are bound to condemn and pay for the easement of light, air and access which plaintiffs enjoyed in James street and State street, and of which they claim to have been deprived by the elevation of the railroad across those streets.

Under a recent decision of this court (*Caldwell & Ward Brass Co. v. State of New York*, 251 App. Div. 781; affd., 277 N. Y. 547) it must be conceded that, if plaintiffs have suffered damage by reason of the railroad's elevation having cut off light, air and access over public streets, they may recover damages. Usually such damages are recovered, not in condemnation proceedings, in which the value of property acquired is paid for (Condemnation Law, § 4, subd. 6), but in actions against the railroad or the State, depending on the state of the statute. (*Reining* v. *N. Y., L. & W. R. Co.*, 128 N. Y. 157; *Caldwell & Ward Brass Co.* v. *State of New York, supra; Lewis* v. *N. Y. & Harlem R. R. Co.*, 162 N. Y. 202, and *Sander* v. *State of New York*, 182 id. 400.)

In view of the peculiar wording of the statute governing the instant case (Laws of 1928, chap. 825, §§ 8, 9), it would seem that plaintiffs might have been remitted to their right to recover damages in the Court of Claims against the State of New York which is not a party to this suit. (*Caldwell & Ward Brass Co.* v. *State of New York, supra.*) That would be so but for a stipulation of the parties which appears in the record.

At the outset the railroad sought to condemn a small parcel of plaintiffs' land concededly acquired by it for its improvement. In its petition it described the land to be taken, and added: "Together with all right, title and interest of, in or to the land in James Street, in front of or adjacent to the above described premises."

The petitioner may well have thought that the quoted phrase referred only to the boiler room and coal bin located in James street and mentioned elsewhere in this opinion, and that the easement of light, air and access over James street was not sought to be condemned. The surmise that this is true is reinforced by the fact that no mention is made of a wish to condemn a similar easement of light, air and access over State street, although the judgment compels the condemnation of such easements over both said streets.

However, the parties stipulated in the record: "That after entry of final judgment and after expiration of time to appeal from final judgment in this action the above mentioned petition and judgment in said condemnation proceedings shall be amended so as to include therein as the property condemned and for which compensation is to be made any additional lands, rights, interest or easements which may be determined in this action to be owned by the plaintiffs herein and which will be taken, acquired or injured by the said The New York Central Railroad Company," etc.

In view of the broad language of this stipulation it serves no purpose for appellants to argue that the easements of light, air and access have been injured or destroyed to the damage of abutting property rather than acquired for use by the railroad, and that the State, which is not a party to this suit, rather than the railroad, is to pay for the deprivation of the easements. The defendant railroad has stipulated to condemn and pay for easements either "acquired" or "injured."

In view of this stipulation it seems clear that the part of the judgment requiring the railroad defendant to add easements of light, air and access over both James street and State street to its petition in the condemnation proceedings should be affirmed.

Condemnation of such easements has been compelled even when not stipulated. (*People ex rel. Dole* v. *Town of Hamburg*, 58 Misc. 643; affd., 127 App. Div. 948; 193 N. Y. 614; *Matter of Tarentelli* v. *City of Corning*, 246 App. Div. 787; affd., 272 N. Y. 600.)

The damages for these easements might have been sought in another well-known form of action, and the court could, therefore, refuse to grant relief by means of declaratory judgment (*Utica Mutual Ins. Co.* v. *Beers Chevrolet Co., Inc.*, 250 App. Div. 348), but since the matter is all before us, since the railroad will have to meet the claim for damages to easements in some forum, and especially

since the railroad has stipulated to meet that claim here, we conclude that this part of the judgment is correct.

4. We come now to the question whether or not plaintiffs have the record title to the three and one-half-foot strip of land heretofore referred to.

The evidence of the various engineers and surveyors, who were sworn, is confusing in the extreme, and contradictory in some important particulars. The contradictions, however, arise largely because the various witnesses assume different premises for their starting points. Old maps do not agree, street monuments have been moved or have disappeared entirely and, most important of all, a description in the deed to McLennan has been variously interpreted.

Out of the mass of confusion a few facts stand out clear and undisputed. Pursuant to statute (Laws of 1850, chap. 140, §§ 22 and 23; Laws of 1871, chap. 560) the West Shore Railway Company, the predecessor of the defendant New York Central, made and filed a map, together with its certificate, showing the proposed route of its contemplated railroad through the territory in question. The purpose of such a map is obvious. (See similar provisions of present Railroad Law, §§ 16, 24.) The purpose is disclosed by the terms of the statute itself. It is to give notice to those whose land is threatened by condemnation proceedings, and the owners of adjacent property which will be affected, so that they may object to the location of the proposed railroad, and provision is made for a judicial hearing upon any disputes that may arise.

The plaintiffs have tried this case on the theory that the railroad, in taking deeds to property, in condemning property, and in deeding surplus property not needed for its purpose, is bound by this so-called location map, or appropriation map, as it is sometimes called, and that description in any deeds given by the railroad, where the term " center line of the railroad " is used, are referable solely to the center location map, or appropriation map. And the trial court adopted that theory. That this was the theory of the plaintiffs and of the court is clearly shown by the record. During the examination of plaintiffs' engineer Cottrell the court said: " All I care about, I want to know where the line of State Street was when that so-called appropriation map was made. That is the time I want to know. The rest of it you can throw away as far as this Court is concerned."

And again: " The crux of the case comes down to a consideration of where the center line of this railroad track was as it was originally plotted out and laid on this appropriation map of 1881," etc.

Again the court, in addressing plaintiffs' counsel, said: " In other words you are saying that the center line must be determined as it was laid down at the time the railroad was constructed in 1881 on this Exhibit 25 at page 14." And counsel answered: " That is it exactly." The meaning of what the court said is clear although the map in question was filed some time before the railroad was constructed.

Counsel for plaintiffs, at another place in the record, being asked if he stood " on the practical location of the railroad," said: " Not on the practical location * * *, but the exact location of the right of way and the center line as shown by that map of 1881 and the distance either side."

One more quotation from the record will serve to show how certain it is that the whole case was tried and decided on the theory that, without regard to what land the railroad finally acquired, and no matter what land it deeded away, the description in its deeds must have reference to a map filed for the purpose of giving the public notice of the proposed location. Plaintiffs' counsel stated: " We stand on sheet 14 of Exhibit 25 [the location map] and on the location of the center line as shown on sheet 14 of Exhibit 25, * * *. Of course, it would be our contention anyway that the railroad company is bound by its own maps, that they under the statute located their own right of way but failed to use this identical map for the purpose of establishing the boundary lines and locations of the property acquired by Judge McLennan."

The railroad filed a location map showing its proposed route. After that route had been approved by the proper authorities the railroad acquired by purchase various parcels necessary to the proposed route. (Deeds, Exhibits 9A and 10A.) Instead of taking deeds of the exact irregular parcels necessary to its right of way the railroad took deeds of entire lot parcels. The surplus of parcels, or of some of them, not needed for the railroad right of way, were deeded to McLennan. (Exhibit 11.) In that deed the land conveyed was described as bounded on its northerly side, by " a line parallel with and twenty-five feet distant from the center line of [the railway] as said railway is now constructed." (Italics mine.) Plaintiffs rest their whole case, according to repeated statements of their counsel, as quoted, upon the proposition that the center of the road " as * * * now constructed " means center line of a fifty-foot strip of land described in a location map that was filed for the purpose already stated. That map was filed in July, 1881, before any construction was started. The railroad did not buy its property till 1882, it did not construct its tracks, at the point in question, until sometime thereafter, and when, on June 7, 1884, it

deeded the property in question to McLennan, the tracks were all laid. The rails were then located as monuments visible to the eye. Railroads do not construct parcels of land, they construct embankments and tracks.

Speaking of the interpretation to be given to words of description in a deed, the Court of Appeals has said: " What words or clauses shall be rejected or qualified in case of uncertainty, is frequently determined by giving effect to those parts or clauses of the description which are most certain and to particulars in respect of which the parties would be least likely to have made a mistake. For this reason, by the general rule of construction, monuments control courses and distances, and estimates of quantity are usually subordinated to both. (*Baldwin* v. *Brown,* 16 N. Y. 359.) The rule that fixed monuments, whether natural or artificial, should usually be given prepondering weight, is obviously reasonable." (*Case* v. *Dexter,* 106 N. Y. 548.)

A cogent reason for this rule is stated in another case in the Court of Appeals: " Thus monuments generally control courses and distances, because grants are supposed to be made with reference to an actual view of the premises." (*Masten* v. *Olcott,* 101 N. Y. 152.)

When McLennan took his deed, the rails (the road " as constructed ") were there. Any layman could measure off twenty-five feet from the center line between them. On the other hand, all the confusing engineering evidence in this case goes to show how difficult it would have been for experts, even, to locate the line in any other way.

The assertion of plaintiffs' counsel that " the railroad company is bound by its own maps " is true within the realm of purpose for which it was filed. But the complaint that the railroad " failed to use this identical map for the purpose of establishing the boundary lines and locations of the property acquired by Judge McLennan," is not well taken. The railroad had a right to sell and the grantee had a right to buy any land the former owned and the latter desired, and they had a perfect right, in the description in the deed, to refer to any map or to no map. They did refer to visible monuments, as then constructed. To be sure, these monuments are movable. Any monuments are movable, including rivers and mountains. But at the time the deed in question was given the rails were fixed and easily seen.

And the evidence is overwhelming, indeed entirely undisputed, that those tracks were never moved between the time they were first laid down and the time of the trial, just before the new elevated structure was erected. If that is so, and if the clause in the deed

("as said railway is now constructed") refers to visible tracks rather than a location map, then the evidence warrants no other conclusion than that the railroad's record title includes all the land taken by it for its recent improvement, excepting the small triangular parcel which it has already started to condemn, and which is described in Exhibit A, attached to the amended complaint.

The trial court, in its opinion, said: " I am not unmindful of the testimony of witnesses to the effect that the tracks as they were at the time of the trial were located in the same position as when they were originally laid down. I do not question the integrity of the witnesses, but I place little value upon such testimony as this. It is a little too much to accept the testimony of witnesses as to location of tracks laid in 1882, some fifty years after the event, to the effect that they are now in the same location as they were when first erected."

Omitting the fact that many of defendants' witnesses testified that the tracks had never been moved, omitting also the undisputed testimony of the defendant railroad's engineers that they monumented the center line of its tracks and that the monuments were right there in the center of the tracks up to the time of the trial, it is difficult to see a reason for not crediting the testimony of the witnesses on this point, since several of the witnesses for the plaintiffs (Cottrell, Preston, Pomeroy, Schulman and Barnard) testified to the same thing and not a witness on either side disputed it.

Furthermore, there is convincing evidence coming from one of plaintiff's own witnesses that when McLennan erected his building upon the lot purchased from the railroad, he built to the line. This witness, one Howard, was the architect employed by McLennan in connection with the building. True, he did not make a survey himself but he had, and relied upon, one furnished him for the purpose of locating the building. It is safe to assume that McLennan, not the railroad, furnished his architect that survey.

There is also undisputed testimony by defendants' witness Ehrehart that McLennan's block was originally planned to be erected so close to the property line that in one place it encroached on railroad property " about three feet " and the railroad objected, and the plans were changed.

We conclude that the only part of the judgment that is correct is that part which relates to the easements of light, air and access discussed in section 3 of this opinion.

The judgment appealed from should be modified on the law and the facts in accordance with this opinion, and as so modified affirmed, without costs. Certain findings of fact should be disapproved and reversed and new findings made.

The order for $2,000 additional allowance of costs should be reversed, without costs.

All concur. Present — SEARS, P. J., CROSBY, CUNNINGHAM, TAYLOR and DOWLING, JJ.

Judgment modified on the law and the facts in accordance with the opinion, and as modified affirmed, without costs of this appeal to any party. Order for $2,000 allowance reversed, without costs. Certain findings of fact disapproved and reversed and new findings made. Settle findings before CROSBY, J., on two days' notice.